Good morning, Your Honors. Good morning. You may proceed. Thank you, Your Honor. My name is Steven Babcock. I'm from the Federal Defenders of Montana. I represent the appellate defendant in this matter, Daniel Lacey. I believe that this case involves three distinct motions to suppress. One that has to deal with the seizure of Mr. Lacey's laptop computer. The search and seizure of media devices taken from the garage of the residence he was co-inhabiting with Carla Dozier. And third, the statement that he gave to law enforcement on the 15th of March in 2005. The first issue on the seizure of Lacey's laptop computer and disks, a brief factual orientation to this case is that Ms. Dozier thought that Lacey was having an affair on him, that they were cheating. She went snooping around on his laptop computer. That snooping language is directly taken from testimony from the suppression hearing and also from a written report that she gave to law enforcement on the 14th of March in 2005. Unfortunately, when she was snooping around, she found sexually illicit pictures of her six-year-old daughter. Now, once she found that, and there was no government involvement in that at all, she then tells the cops. So they've now got probable cause. Is that not right? Well, Your Honor, I would argue as though that he still has an expectation of privacy, and that is something that is brought up. You didn't answer my question, however. Did they then have probable cause? I believe that they would have probable cause, but the correct procedure for them would have to obtain a warrant. So factually here, they went and they seized it because they didn't want him wiping stuff out. Then they got a warrant before they searched it. Now, what's wrong with that? Well, I guess, Your Honor, what was what, in answering your question, is what they should have done was to get a warrant before the seizure either existed at all. That is our position. And I think that is supported by the Court's ruling in Fay. In Fay, you had an individual that told law enforcement, he keeps the firearm in that bag. She knew the firearm was there. Doesn't she? Oh, sorry. You're just putting aside the consent issue completely. No, I am not, Your Honor. I believe that the consent in this case, she did not have actual or apparent authority to consent to the seizure of the computer in this case. You don't think at least she had at least apparent authority? In other words, she says to the police something like this, right? I'm looking into this computer my boyfriend has, and it's got these pornographic pictures of my daughter. Obviously, she has access to the computer. It's in her room or something. And, you know, either she has a password. There is no password. So he's not concerned with that password privacy. So why isn't that at least apparent, you know, authority? Well, and apparent authority, of course, would involve that law enforcement believe that she had the right to do that. Yeah, right. Why shouldn't they believe it from those circumstances? I guess I would. It's in her house. You know she can access it. She's looked at it. Yeah. And I guess, Your Honor, I would respectfully disagree on that because the officer in this case knew that it was Lacey's computer. She, the officer in this case, also knew that she infrequently used the computer, that she had to do an extended file search on the computer to find these pictures. So I would say that there was no apparent authority, and there was no actual authority in this case.  Did he ever tell her, no, you can't touch my computer? Mr. Lacey testified at the suppression hearing that, yes, he made it very clear that no one is to go through the computer unless he was present. So I believe that that is substantiated by the fact that he did. Did the computer have a password? The computer did not have a password, but she was not able to find the files until she did an extensive file search on this. The other issue that I would like to go to in this case would be the search and seizure of media devices that were taken from Lacey's garage. Ms. Dozier testified that her personal belongings were co-mingled with Mr. Lacey's personal belongings in that garage. But I believe that Special Agent Verthauer, who testified in this case, said before the search of the garage commenced that Ms. Dozier informed him that Mr. Lacey's items were mainly located on the back end of that wall. And that's where they found this media stuff? That's where they found the media stuff, yes. And the media stuff, I believe, should be considered as closed containers. There is nothing immediately apparent that they are contraband. And what are you talking about, like a disc or something like that? Yes, Your Honor. There was an 8-millimeter film disc. There was also some VHS tapes. There was a CD-ROM. Nothing by the appearance of those items in plain view analysis would make it that it was contraband. The officers knew that these items belonged to Lacey. Ms. Dozier testified to that at the suppression hearing, that she informed them that these all belonged to Dan. The record is certainly devoid of any information that she had any personal knowledge, unlike the previous issue, what was on those media devices. And unlike the district court made a finding that everything was commingled. Correct. Was that accurate? I do not believe that it was accurate. If you take a look at the analysis that this Court has used in Fultz, that this is a closed container. And it does not stop whether or not she has access to that or not. I believe the language of that is a person does not forfeit their expectation of privacy in a closed container. No, but my recollection of Fultz, which seems to me is distinguishable here, is that in Fultz, you know, that person's stuff, I'll call it, was clearly separated, segregated. And, you know, these are my stuff and don't touch them. And here, there was a finding that they were commingled. And it wasn't clearly identified. You know, this corner is so-and-so's and this corner is somebody else's. I mean, that was the situation in Fultz. That's not the situation here. Well, Your Honor, I would respectfully disagree because this was a closed container, much as the boxes were in Fultz. No, but I mean the closed containers was amongst all these jumbled up items. Correct. And I believe that the facts in Fultz also show that her items were located right next to that. And also, the consentor in Fultz, that there was her children's articles were right around there, too. So I guess I would say that the boxes in Fultz would be completely analogous to the media devices in this case. Counsel, if I were to agree with you, tell me which accounts relied on the stuff from the garage and which accounts relied on the computer and the disks that were by the computer. Well, Lacey, of course, he pled guilty to two counts of sexual exploitation and a count of child pornography. Of course, the child pornography possession would not apply to anything that was found within the garage. But I believe my memory serves me correct that the counts that deal with the sexual exploitation were because of the media devices that were taken without a search warrant from the garage. You can't. I wanted you to tell me if, okay, he pled to count two and count. Count three, yes. Yes. Okay. I would say that counts two and counts three would be affected by the search from the taking of the media devices that were located in the garage. Are you sure about count three? That's the best to my knowledge, yes. I guess I'm not 100% sure. But I would say that that's what I'm thinking is accurate at this time. The third issue I'd like to talk about, and if I could briefly touch on this and reserve a little bit of time for rebuttal, is the statement that Lacey gave in this case on the 15th of March. The government has contended that that issue has not been perfected for appeal. We respectfully disagree. There was a motion to suppress in this case that had to deal with the coercion and manipulation of the government in giving that statement. There was testimony at the suppression hearing from Detective Cady where his personal relationship that Mr. Lacey was a friend of the family went through very thoroughly. Counsel, at least I have seen it and maybe my co-panelists have seen the video. Correct. At least I saw the Cady portion and then the first few minutes of the interrogation. I've seen a lot of these in my life, and this was probably one of the most benign I've ever seen. I don't understand your psychological coercion argument. And I think that I'm asking the Court to look at the totality of the circumstances as mandated by Miranda before the statement was given. I mean, he was brought in by a family friend. He was told by Detective Cady that, you know, these guys are good guys. They're not going to hurt you. They're not going to bite you. I'm here as a friend. The testimony at the suppression hearing from Detective Cady was clearly as though that as a supervisor of detectives, this would give an appearance of impropriety and that this is something that he would say would not be correct procedure. So I think outside of the tape that was watched by us. Well, you know, impropriety and not correct procedure is not the same as coercion. No, but I believe that it rises to a level of coercion. And the reason why is because the trusting relationship. And Lacey gave the statement, we believe. Coercion doesn't depend on a trusting relationship. No. The trusting relationship brought him in and then also the rest of the conversation that they had that more or less told them, yeah, give a statement with these guys. And that's what happened. If I could just reserve the last little bit. Before you sit down, I want to ask you about the notice of appeal. Correct. Do you remember your language? Yes. I believe that my language, first of all, had to deal with the judgment. We amended that to specifically talk about these issues. It was a conditional plea that he entered on this case. I'm just talking about what you said in the notice of appeal. I can't remember 100 percent, but I believe that. I'll tell you what you said. Okay. You said you're appealing the sentencing hearing. And I guess if that's exactly what I said, we're not doing that at this point. I hope you're not. No. That's it. I'm not saying. Okay. Thank you. Thank you, counsel. Ms. Hurd. Once again, for the record, I'm Marcia Hurd from the District of Montana. I handled this case below and assisted in the briefing with my co-counsel, Eric Wolf. Of the three issues in this case, at first, maybe I should clarify the record. Mr. Lacy did file a notice of appeal saying he was appealing sentencing issues. I called him and I said, I think you've used the wrong form. And he filed an amended notice of appeal, is my memory. And I think what happened when he was doing the excerpts of record is that his assistant probably put it in the first notice of appeal and not the amended notice of appeal. Because I recall seeing an amended notice of appeal where he said, I'm only going to appeal the suppression issues. It's not in the excerpt of record. Yeah. And I see that now. I'm pretty certain that there – I know that there is an amended notice of appeal that he filed. Well, let's assume that all the issues are on the table. Okay. Would you just clear up the record of the proceedings for me now. To which counts did he plead guilty? Okay. He pled guilty to count two, which was a videotape of an 18-month-old girl who was the daughter of a friend of his who was babysitting the sexually abused. Her initial is J. And that videotape came from where? From the garage. Garage. Okay. And then what else did he plead guilty to? He pleaded guilty to count three, which are the images on the computer involving a little 6-year-old girl whose initial is A, who was the daughter of his current girlfriend. Count one, to which we dismissed, was an 8-millimeter tape that we found in the garage of him sexually abusing his – I need to be careful with this – a family member, a small boy. He did not plead to that count, but that also came from the garage. All right. So the record is clear. The only issue for his garage search would be count two, which was the video that was found during the garage. All right. Thank you. Then he pled to more than two and three. He pled to one more. He did. Those were just the two production counts. He pled also to the possession of child pornography, which was the computer. So that wouldn't be – the only count that would be affected would be count two. If we could talk just briefly – Each of the sexual exploitation counts carried 240 months, I believe. I think there was – I think the one for three was longer than the one for two. Let me look here. I know that the total sentence ended up being – 30 years. 360 months, 30 years, which was below the guideline range. But I think the 30-year one was count – Right. Three? He actually – we recommended 60 years. We recommended that they be stacked. Lacy recommended 20 years. And if you look at my brief on page 10, he sentenced Lacy to 240 months on count two, 360 months on count three, and 120 months on count five, which was the possession. Ran the terms concurrently, and that's in ER-191. So even if you throw out the tape in the garage search, which I think would not be appropriate, his sentence of 360 months stands. Let me just briefly address his argument about the Miranda issue. I know that the entire tape was sent to you for your review. And if you look at the entire tape, which is approximately an hour and ten minutes long, the only place in which Officer Cady appears is the very beginning. So there's no other portion in which he appears. But if you look at the excerpts of record, pages 8 through 16, he absolutely did not raise as an issue for the district court to consider that Officer Cady assisted in any fashion in coercion in this interview. Officer Cady's name is mentioned once in the brief below, which was he was questioned by Detective Veerthaler. He's the one who was his friend? Yes. Go ahead. Detective Veerthaler, Detective Beckers, and Detective Cady. That is the mention, the only mention in the brief and in the motion below of Detective  The brief below specifically addressed and the hearing specifically addressed allegations that FBI agent Dan Veerthaler basically overbore Mr. Lacey's will, interrupted him, didn't clarify for him, didn't let him speak, those kinds of things. There was never an allegation below in the moving papers, nor was it addressed in the judge's order because it was not raised that Detective Cady's friendship with Mr. Lacey was somehow coercive or was the reason for this problem. Let me ask you this, Counsel. At the beginning of the interrogation by the two officers, he says, well, you know, I've been told that I ought to have a lawyer. Now, in his brief, I guess, he says that several times he tried to invoke that. I didn't watch the full tape. I watched part of the beginning. Are there other places on the tape where he invokes the right to counsel? Not at all. The only other mention of the word lawyer is about 60-some minutes into the tape, literally at the very end, after they've made the decision that he's going to jail, they're trying to arrange for his car and his car keys and getting his camera out of the car that's in the parking lot, and it's just he and Agent Veerthaler who are actually in the interrogation room, and he says, well, I just have some questions, and this is the reason I wanted a lawyer, and here's what my dad wants to know, and here's what my lawyer wanted to know, and here's what I want to know. How much time am I looking at? That's the only other mention of an attorney in, you know, in that situation at all. So unless there are other questions about the Miranda issue, I'd like to move on to the search issues. First, the search issue of the computer. I think that the panel has hit squarely on what the problem in his argument is. First, she sees definitely illegal contraband on the computer involving her daughter. She calls the police, and she has every right to give him that computer, and the police have every right to take that computer. It's like if she found a baggie of marijuana and said, come and get this out of my house, it's illegal, it's contraband, and they take it. So you have that first issue. But you also have the second issue. She tells them the ---- Wasn't that controverted? You heard Mr. Donahoe say that there was testimony that he never gave her authority. Oh, and the second issue. I mean, I think, okay, the first issue is it contained contraband, and it didn't matter who had authority to give consent to take the computer. As long as an officer knows that something has contraband on it, they can't just leave it sit there.  I'm not telling you there's cocaine in there. I've seen cocaine in there. They certainly have the right to take it and look further. And in this case, what she told ---- I'm sorry. You're saying the computer itself is contraband. Yes, because it contained the hard drive. Because the hard drive has these images. Exactly. And in this case, she told them that she used the computer. Whether she uses it as much as he does, less than he does, when he's there or not there, he certainly knew she was using the computer. In fact, when she found the pictures, she was so horrified, she started deleting them, and then went, oh, my goodness, what have I done? She called him at work on the phone and said, I'm on the computer, and I've accidentally deleted some pictures. And he said, which pictures? And she said, oh, pictures of you and I, because there were pictures of the two of them in sexually explicit conduct on the computer. And he said, well, here's how you get them back. He didn't say to her, get off the computer. You're not allowed to use that when I'm not here. You know that. You can't do that. There was absolutely no testimony other than one rather self-serving statement in the suppression hearing, where he says that he didn't allow people to use the computer when he wasn't there, at least not to his knowledge. But at the one point where he could have said to her on the phone, you can't be on the computer, he didn't. And it was clear that they looked at pornography on the computer together. They played internet pornography or internet poker together. She used it for e-mail and various things like that. That she infrequently uses the computer isn't the test. Just because I infrequently use the kitchen in my home because my husband cooks all the meals doesn't mean it still isn't my kitchen and I still don't have access to it. And it's the same in this situation. She certainly had at least a parent authority, even if you want to go past the actual authority. And it's the same issue with regard to the garage search. These were people who were a couple. They lived together as a family for a period of a year. There were no separate areas within the home or the garage. There were no separate containers that were marked and sealed as these are mine, you can't touch. And if you had watched that video in its entirety, there's a portion in which towards the very end, Mr. Lacy says to the agents, they've told him that they've taken some things out of the garage. And he said, what did you take? And they tell him, well, we took some CDR and we took some videotapes. And he just gets this look on his face and he says something to the effect of, have you looked at them? And they said, well, we have to look at them, you know, and make sure there's no contraband like what we found before. And he kind of goes, oh, okay. And a little later on he said, well, I'm glad you took those things so Carla couldn't see them because, you know, some of them have pictures of me and an old girlfriend on them. So it's really kind of an interesting, he says at one point, oh, that's okay that they've taken these. And then he tries to tell the officers, oh, it's just party videos and me driving around in my car and this kind of thing. Says I've never had any sexual contact with anybody else. There's nothing on those videos, which turned out to be completely and utterly false. Both, there are videos of two other victims that we found within there. And the closed container argument and the FULS argument just absolutely doesn't work in this case because this is not FULS, as you have pointed out. In FULS, the defendant's items were in boxes completely segregated in the garage, in storage, from the woman who lived there. They were not intermingled. They were not commingled. She didn't have authority to go into them. And, in fact, in the opinion, it indicates she probably didn't even consent to them looking in the boxes. She just said his things are over here. And there was kind of an argument about whether she consented or not. That isn't this case. Everything that they had not yet unpacked was in the garage. And that's very clear. Roberts. Thank you, counsel. Your time has expired. Thank you. Mr. Donahoe, our questions took you past your time, but I'll give you up to one minute because we you had asked for the opportunity to respond. I guess to clarify, and I do think misheard about that, my memory now does certainly correct that there was an amended notice to appeal that was filed in this court. And I apologize for that, not making it in the excerpts. As far as count two and count three, the difference in the statutory maximum is I believe that count two was pre-protect act. So the statutory maximum, of course, on count three was post-protect act, so that took it to 30 years from 20 years. I believe that our strongest issue, of course, is the search of the media devices that were in the garage. And I think it is clear that they are a closed container, that nothing about the media devices taken was immediately apparent as contraband. There was testimony from Agent Bertholder that he certainly knew that the items located on that back wall were Mr. Lacey's. There was testimony from Ms. Dozier that, yes, those devices taken, she informed law enforcement, are Mr. Lacey's. The record is devoid of any information that she knew the contents. The correct procedure would have been for them to get a warrant, which they did not. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision.
judges: B. Fletcher, O'scannlain, Tashima